Robert G. **LILE**, Plaintiff–Appellee/Cross–Appellant,

v.

David R. **McKUNE** and Charles Simmons, Defendants–Appellants/Cross–Appellees.

Nos. 98–3292, 98–3294.

United States Court of Appeals, Tenth Circuit.

Sept. 5, 2000.

Timothy G. Madden, Kansas Department of Corrections, Topeka, Kansas, for Defendants–Appellants/Cross–Appellees.

Matt Wiltanger (David J. Waxse and Paul W. Rebein with him on the briefs) of Shook, Hardy & Bacon L.L.P., Overland Park, Kansas, for Plaintiff–Appellee/Cross–Appellant.

Before SEYMOUR, Chief Judge, McKAY and EBEL, Circuit Judges.

McKAY, Circuit Judge.

These cross-appeals arise out of an action brought by Plaintiff Robert G. Lile under 42 U.S.C. § 1983. Plaintiff is a prisoner at the Lansing Correctional Facility in Lansing, Kansas. On January 6, 1983, he was convicted in Kansas state court of aggravated kidnaping, rape, and aggravated sodomy.[1] He pleaded not guilty to these charges and testified at trial that he had consensual intercourse with the alleged victim. Though not part of his original sentence, the Kansas Department of Corrections recommended in 1994 that Plaintiff participate in the Sex-

ual Abuse Treatment Program[2] [SATP or program] because he had been convicted of sex offenses and added it to his Inmate Program Agreement [IPA]. To be admitted into the program, Plaintiff was required to disclose his sexual history, including the crime of which he was convicted and any uncharged sexual offenses. He refused to make any such admissions and, on October 11, 1994, refused to sign his amended IPA.

After pursuing his administrative remedies without success, Plaintiff filed a § 1983 action against the State, naming the warden of the Lansing Correctional Facility and the Secretary of the Kansas Department of Corrections as defendants. He claimed first that the SATP and its corresponding regulations and policies violated his Fifth Amendment right against self-incrimination and second that the implementation of the SATP violated his Fourth Amendment right to privacy and bodily integrity. Specifically, he argued that Defendants' policy of withholding privileges and benefits penalized him for refusing to provide potentially incriminating information related to past sexual behavior or offenses and therefore violated his Fifth Amendment right against self-incrimination. He also complained that his Fourth Amendment rights were violated by the intrusive nature of the plethysmograph examination.

Ruling on cross-motions for summary judgment, the district court granted summary judgment to Plaintiff on his claim that the SATP violated his Fifth Amendment right against self-incrimination, but it granted summary judgment to Defendants on the Fourth Amendment claim. *See Lile v. McKune*, 24 F.Supp.2d 1152 (D.Kan.

---

1. Kansas courts affirmed Plaintiff's convictions on direct appeal, *see State v. Lile*, 237 Kan. 210, 699 P.2d 456 (1985), and rejected his applications for postconviction relief. In March 1999, the United States District Court for the District of Kansas denied Plaintiff's 28 U.S.C. § 2254 petition for a writ of habeas corpus. *See Lile v. McKune*, 45 F.Supp.2d 1157 (D.Kan.1999).

2. In 1994, the treatment program was known as the Sex Offender Treatment Program or SOTP. Because the program is now called the SATP, we shall refer to it as such in this opinion.

1998). We exercise jurisdiction under 28 U.S.C. § 1291.[3]

We review the denial or the grant of summary judgment de novo, applying the same legal standard used by the district court. *See Kaul v. Stephan,* 83 F.3d 1208, 1212 (10th Cir.1996). Summary judgment is properly granted where, viewing the factual record and the reasonable inferences therefrom in the light most favorable to the nonmoving party, "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Charter Canyon Treatment Ctr. v. Pool Co.,* 153 F.3d 1132, 1135 (10th Cir.1998).

## I. Fifth Amendment

 The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend V. Although this language is somewhat narrow, the Supreme Court has interpreted it broadly. *See, e.g., In re Gault,* 387 U.S. 1, 50, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) (The privilege is to be "broadly applied and generously implemented in accordance with the teaching of the history of the privilege and its great office in mankind's battle for freedom."). The right not only applies to an individual's criminal trial but also "privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Lefkowitz v. Turley,* 414 U.S. 70, 77, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973); *see Minnesota v. Murphy,* 465 U.S. 420, 426, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984). The privilege has two components: incrimination and compulsion. Although it is not entirely clear whether Defendants assert that the SATP

was not incriminating, we briefly address this issue.

## A. Incrimination

 The privilege guarantees every person the right to remain silent when faced with a real and appreciable risk of incrimination in a criminal proceeding. *See Minor v. United States,* 396 U.S. 87, 98, 90 S.Ct. 284, 24 L.Ed.2d 283 (1969). If the possibility of incrimination is too speculative or insubstantial, the privilege does not attach. *See id.*

In this case, the district court found that "the information required to be disclosed under the SATP . . . is sufficiently incriminating for Fifth Amendment purposes." *Lile,* 24 F.Supp.2d at 1157. We agree with the district court that "[b]y requiring the complete and written disclosure of a prisoner's sexual history, including all uncharged sexual offenses, SATP clearly [sought] information that could incriminate the prisoner and subject him to further criminal charges." *Id.* (footnote omitted). This is especially true in this case because no confidentiality is afforded such disclosures; an admission of any information concerning uncharged sexual offenses against minors must be turned over by the SATP staff to the proper authorities under Kansas law. *See* Supp.App. at 253; Kan. Stat. Ann. § 38–1522 (mandating reporting of abuse or neglect of children). In addition, all SATP files, including the sexual history form, are subject to disclosure by subpoena or other court order. *See* Supp. App. at 116–18, 253; 42 C.F.R. §§ 2.63(a)(2), 2.65 (authorizing disclosure of confidential communications and patient records for criminal investigation or prosecution of patient); *see also Lile,* 24 F.Supp.2d at 1157 n. 7 (distinguishing *Chambers v. Bachicha,* 39 F.3d 1191, 1994 WL 596702 (10th Cir.1994) (Table), which

---

**3.** This court has appellate jurisdiction over the district court's September 16, 1998 Order granting summary judgment to Plaintiff on his Fifth Amendment claim and granting summary judgment to Defendants on Plaintiff's Fourth Amendment privacy claim. According

to the district court's subsequently filed December 29, 1998 Order, "no claim remains to be decided" and the September 16 Order was "intended as a final appealable order under 28 U.S.C. § 1291." App., Vol. 1 at 254.

found no Fifth Amendment violation in part because of confidentiality of prison records); *cf. Neal v. Shimoda*, 131 F.3d 818, 833 & n. 18 (9th Cir.1997) (rejecting Fifth Amendment self-incrimination claim because of absence of evidence of a real possibility that state would use admission to sex offenses against plaintiffs in future criminal proceeding and because "there [was] no danger that [an] ... inmate would be compelled to admit to other sexual misconduct of which prison or law enforcement officials were not already aware"); *Tedder v. Francke*, 931 F.2d 897, 1991 WL 65497 (9th Cir.1991) (Table) (holding that Oregon sex offender program did not violate plaintiff's right against self-incrimination in part because admissions made would be privileged under Oregon evidence rule). Plaintiff knew that any incriminating information he disclosed could be used to prosecute him. In fact, Defendants concede that inmates are "advised that information obtained during the course of treatment [in the SATP] has limited confidentiality" and will be given to law enforcement officials if prosecutable. Defendants' Third Br. at 3.

Additionally, an admission of culpability regarding the crime of which Plaintiff was convicted would put him at an appreciable risk for a perjury prosecution, especially because he testified at trial that he was not guilty. *See Thomas v. United States*, 368 F.2d 941, 945 (5th Cir.1966); *State v. Cate*, 165 Vt. 404, 683 A.2d 1010, 1019 (1996). Having determined that the incrimination element of the Fifth Amendment privilege analysis is satisfied, we now turn to the more difficult issue of compulsion.

## B. Compulsion

In *Lefkowitz v. Cunningham*, 431 U.S. 801, 807, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977), the Supreme Court emphasized that "the touchstone of the Fifth Amendment is compulsion" and recognized that the imposition of penalties is the mechanism by which persons are compelled to incriminate themselves. *See id.* at 804–05, 97 S.Ct. 2132; *Garner v. United States*, 424 U.S. 648, 653, 96 S.Ct. 1178, 47

L.Ed.2d 370 (1976). The privilege provides an individual with the right "not to answer official questions put to him in any ... proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Turley*, 414 U.S. at 77, 94 S.Ct. 316.

After finding that the disclosure of Plaintiff's sexual history required by the SATP was "sufficiently incriminating for Fifth Amendment purposes," *Lile*, 24 F.Supp.2d at 1157, the district court determined that the SATP and its corresponding regulations and policies impose significant adverse consequences on Plaintiff and "operate[ ] to compel the disclosure of such incriminating testimony" in violation of the Fifth Amendment privilege. *Id.*

Defendants argue that the court "erred in concluding that the withholding of discretionary privileges from an inmate as a consequence of the inmate's refusal to participate in a rehabilitation program constituted compulsion within the meaning of the Fifth Amendment." Appellants' Br. at 7. They claim that no compulsion exists because Plaintiff's decision to participate or not participate in the SATP is voluntary and because Plaintiff has no protected liberty interest in any of the privileges that would be withheld.

In response, Plaintiff argues that by requiring him to complete an admission of responsibility form and disclose his sexual history, and by imposing adverse consequences for his failure to do so, the SATP unconstitutionally compels him to reveal potentially incriminating information about his sexual history and thus violates his Fifth Amendment right against self-incrimination.

■ Supreme Court jurisprudence concerning the Fifth Amendment right against self-incrimination instructs that, unless an individual is given immunity at the time of his potentially incriminating testimony, he may not be confronted with the dilemma of either answering questions that may incriminate him or being sub-

stantially penalized solely for the assertion of his constitutional privilege. *See Garner,* 424 U.S. at 661, 96 S.Ct. 1178 (indicating that where the assertion of the privilege is penalized it "foreclos[es] a free choice to remain silent[ ] and therefore ... compel[s] the incriminating testimony"). In other words, "a State may not impose substantial penalties because a [declarant] elects to exercise his Fifth Amendment right not to give incriminating testimony against himself." *Cunningham,* 431 U.S. at 805, 97 S.Ct. 2132; *see also Murphy,* 465 U.S. at 434, 104 S.Ct. 1136. Resolution of the compulsion question in this case then turns on whether the consequences of Plaintiff's refusal to admit responsibility for his charged and uncharged sexual offenses constitute substantial penalties that are impermissibly coercive.

### 1. Adverse Consequences

In order to properly assess whether there has been a violation of the Fifth Amendment, it is essential to understand the precise nature of the adverse consequences that result from Plaintiff's refusal to sign an Admission of Responsibility form and disclose his sexual history. Plaintiff asserts that he would suffer the following consequences: Termination from the SATP and the resulting transfer out of a medium security facility into maximum security housing; loss of visitation, job, canteen, and prison programming privileges; denial of eligibility for parole; and denial of the opportunity to earn good-time credits.

The record reflects that Plaintiff would, in fact, be subject to a transfer out of medium security to maximum security for his refusal to participate in the SATP by refusing to admit responsibility.[4] Accord-

ing to the Kansas Department of Corrections' Internal Management Policies and Procedures [IMPP], Plaintiff's incentive level would be automatically reduced from Level III to Level I. *See* App., Vol. I at 23–24 (IMPP Rule 11–101). Practically, this means that the Department would automatically transfer Plaintiff from a medium security facility to maximum security housing. *See id.* at 24; Supp.App. at 285. This change in incentive level and transfer would restrict Plaintiff's privileges. Specifically, he would lose his personal TV; he would have limited access to prison organizations and activities and would be unable to participate in the IMPP; he would have limited access to the gym and yard area; there would be a substantial reduction in the amount of money he could spend in the canteen per pay period, from $140 per payroll at Level III to $20 per payroll at Level I; he would receive a reduction in pay and intake property; and he would have substantially restricted visitation privileges. *See* App. at 29.

■ Turning to Plaintiff's claim that he would be denied parole for his refusal to participate in the SATP, Plaintiff cites Kan. Stat. Ann. §§ 75–5210a and 22–3717.[5] Section 22–3717(g) provides:

> [T]he Kansas parole board may release on parole those persons confined in institutions who are eligible for parole when: ... (2) the secretary of corrections has reported to the board in writing that the inmate has satisfactorily completed the programs required by any agreement entered under K.S.A. § 75–5210a and amendments thereto, or any revision of such agreement.

Section 75–5210a requires an inmate and the secretary of corrections to enter into a

---

4. In an order filed April 23, 1996, the district court granted Plaintiff temporary injunctive relief directing Defendants to keep Plaintiff on the SATP waiting list and enjoining them from applying the privileges and incentives program to Plaintiff because of his refusal to admit responsibility for his offense and disclose his sexual history as required by the SATP.

5. Though Plaintiff cites § 22–3717(k) in support of his claim that he will be denied eligibility for parole, that section appears to have no bearing on the issues in this case. Subsection (k) states, "Parolees and persons on post-release supervision shall be assigned, upon release to the appropriate level of supervision pursuant to the criteria established by the secretary of corrections." Kan. Stat. Ann. § 22–3717(k).

written agreement "specifying those educational, vocational, mental health or other programs which the secretary determines the inmate must satisfactorily complete in order to be prepared for release on parole or postrelease supervision."

According to the record, Plaintiff entered into a program agreement and promised to complete the Sexual Offender Treatment Program (the precursor to the SATP) on June 1, 1995. Although the language of §§ 75–5210a and 22–3717(g) suggests that Plaintiff is required to complete the SATP in order to be eligible for parole, this is not the case. In *Payne v. Kansas Parole Board*, 20 Kan.App.2d 301, 887 P.2d 147, 150 (1994), the Kansas Court of Appeals held that §§ 75–5210a and 22–3717(g)(2), which became effective on March 1, 1995, do not apply retroactively. The *Payne* court noted that "[§ ] 75–5210a directs the Secretary of Corrections to enter into program agreements only with newly committed inmates" and that "successful completion of a program agreement was not a prerequisite for parole prior to the 1988 enactments." *Id.* Like the petitioner in *Payne*, Plaintiff's conviction in 1983 occurred long before these provisions were enacted. Thus, under *Payne*, Plaintiff is not required to enter into or complete a program agreement pursuant to §§ 75–5210a and 22–3717(g)(2) to be eligible for parole. *See id.; see also Johnston v. Simmons*, 45 F.Supp.2d 1220, 1224 (D.Kan.1999) (relying on *Payne* to hold that §§ 75–5210a and 22–3717 did not result in an ex post facto violation where plaintiff had been convicted prior to the effective date of these provisions because "plaintiff is not required to enter into a program agreement, nor is he required to complete any agreed programs as a condition of his parole").

■ Plaintiff has also failed to demonstrate that he would lose good-time credits for his refusal to participate in the SATP.

Plaintiff's assertion in his brief that he would suffer such a consequence is not supported by the record or legal authority. Under Kan. Admin. Reg. §§ 44–6–124(g)(6) and 44–6–142, some Kansas inmates may lose good-time credits for their refusal to complete a program such as the SATP. Section 44–6–142 provides that "good time credits shall be awarded on an earned basis pursuant to [§ ] 44–6–142 for the purpose of determining the conditional release date," [6] and § 44–6–142 states that "[a] refusal by an inmate to constructively work or participate in assigned programs shall result in the withholding of 100% of the good time credits for that program classification review period." However, Plaintiff's good-time credits are not calculated by reference to these regulations because he was convicted prior to March 1, 1995. *See Bankes v. Simmons*, 265 Kan. 341, 963 P.2d 412, 421 (1998) (holding that application of these regulations to inmates convicted prior to March 1, 1995, violates the prohibition in the United States Constitution against ex post facto laws), *cert. denied, Hannigan v. Stansbury*, 525 U.S. 1060, 119 S.Ct. 629, 142 L.Ed.2d 567 (1998); *Stansbury v. Hannigan*, 265 Kan. 404, 960 P.2d 227, 230, 236 (1998) (same with respect to inmate who was convicted of rape in 1991 and refused to participate in the SATP), *cert. denied*, 525 U.S. 1060, 119 S.Ct. 629, 142 L.Ed.2d 567 (1998). Plaintiff's good-time credits therefore are calculated under the old regulations which do not penalize inmates for the failure to participate in the SATP. *See Stansbury*, 960 P.2d at 233.

As a result, the adverse consequences that Plaintiff would face for the refusal to participate in the SATP are the transfer to maximum security prison and the resulting loss of privileges. The critical question, then, is whether the State's imposition of these consequences in response to Plaintiff's invocation of his Fifth Amendment right against self-incrimination constitutes impermissible compulsion.

**6.** This means that, for qualifying prisoners, good-time credits are earned as the sentence progresses rather than presumed based upon maximum conduct and subject to forfeiture for misconduct.

## 2. Analyzing Compulsion

Determining whether the challenged policy or action is compulsory for Fifth Amendment purposes is a difficult task that depends upon consideration of many factors. There is no single test or factor that is dispositive, so we begin by examining Defendants' arguments.

### a. The *Sandin* Analysis

Defendants argue that no compulsion exists because the adverse consequences present in this case implicate no protected liberty interest. Specifically, they claim that the Fifth Amendment is not violated because the consequences that would be imposed on Plaintiff as a result of his refusal to admit responsibility and disclose his past sex offenses do not constitute "atypical and significant hardship[s] on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

In *Sandin*, the Supreme Court addressed liberty interests in prison in the context of a procedural due process claim. The Court held that, despite the mandatory language of the applicable prison regulation, a constitutionally protected liberty interest will generally be "limited to freedom from restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484, 115 S.Ct. 2293 (citations omitted). Applying this test, the Court held that being placed in disciplin-

ary segregation for thirty days did not impose an atypical and significant hardship, and therefore the inmate had no protected liberty interest which required due process. *See id.* at 486, 115 S.Ct. 2293. Relying on earlier Supreme Court precedent, *Meachum v. Fano*, 427 U.S. 215, 225, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), this court recognized that, under the Due Process Clause, a change in "an inmate's prison classification ordinarily does not deprive him of liberty[ ] because he is not entitled to a particular degree of liberty in prison." *Templeman v. Gunter*, 16 F.3d 367, 369 (10th Cir.1994).

However, nowhere in the relevant jurisprudence does the Supreme Court even hint that an individual attempting to show a violation of his Fifth Amendment privilege must have a protected liberty interest for compulsion to occur.[7] *See Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 285–88, 118 S.Ct. 1244, 140 L.Ed.2d 387 (1998) (evaluating Fifth Amendment claim without any reference to liberty analysis and applying liberty interest analysis to due process claim only). From our review of the cases, *Sandin* has not been expressly used to analyze any kind of constitutional right claimed by a prisoner other than a due process violation. Moreover, nothing in either Supreme Court or Tenth Circuit precedent "expressly rule[s] out a challenge to a [prison policy] . . . on the ground that it violate[s] constitutional rights other than the right to procedural due process." *Furtado v. Bishop*, 604 F.2d 80, 87 (1st Cir.1979) (explaining that Supreme Court precedent allows that a prisoner's confinement could violate the

---

7. In their brief, Defendants imply that the Eight Circuit's decision in *Callender v. Sioux City Residential Treatment Facility*, 88 F.3d 666 (8th Cir.1996), is one in which the court determined that there was no compulsion under the Fifth Amendment because the prisoner had no liberty interest in remaining in a work-release program. *See* Appellants' Br. at 15–16. Defendants' reliance on *Callender* is misplaced. In that case, the district court held that the prisoner's procedural due process rights had been violated because he was deprived of the liberty interest of remaining in the work-release program. The district court

also held that requiring the prisoner to admit his guilt violated the Fifth Amendment right against self-incrimination but that the treatment center was entitled to qualified immunity on that claim. The Eight Circuit reversed. Observing that a sex offender program was part of the work-release program, the court held that revocation of the work-release program based on the prisoner's refusal to admit guilt did not violate the *Due Process Clause* because no liberty interest was implicated. The Eight Circuit did not address the Fifth Amendment claim. *See Callender*, 88 F.3d at 668–69.

constitution even if it did not implicate a liberty interest or violate due process); *see also Frazier v. Dubois,* 922 F.2d 560, 561 (10th Cir.1990) (surveying circuit court decisions and holding that *"Meachum* addressed only the due process clause"). This reasoning is equally applicable to a challenge to a sex offender treatment program based on a Fifth Amendment violation. *Cf. Chambers v. Bachicha,* 39 F.3d 1191, 1994 WL 596702 (10th Cir.1994) (Table) (rejecting equal protection and due process claims because plaintiff challenging Colorado sex offender treatment program had no protected liberty interest in good-time or earned-time credit under discretionary Colorado statute, but not addressing liberty question with respect to Fifth Amendment claim); *Colman v. Lahouse,* 976 F.2d 724, 1992 WL 235534, at *3 (1st Cir.1992) (relying on *Furtado* to state that Fifth Amendment claim challenging sex offender treatment program has an arguable legal basis because no liberty interest is required).

 Accordingly, we agree with the district court's assessment that "by grafting a protected liberty interest to a finding of compulsion, the standard is set too high." *Lile,* 24 F.Supp.2d at 1159. Compulsion can be established by hardships that may not be atypical and that do not constitute enforceable liberty interests. The Supreme Court has indeed articulated several different types of penalties that constitute impermissible compulsion, none of which are explicitly characterized as deprivations of protected liberty interests. These include the threat of disbarment, damage to professional reputation, or loss of income, *see Spevack v. Klein,* 385 U.S. 511, 516, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967) (describing such penalties as "powerful forms of compulsion"), economic penalties such as the loss of employment, *see Turley,* 414 U.S. at 82, 94 S.Ct. 316 (ruling that cancellation of contracts and five-year disqualification to contract constituted impermissible economic compulsion); *Uniformed Sanitation Men Ass'n v. Commissioner of Sanitation,* 392 U.S. 280, 283–85, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968) (holding that discharge for invoking and refusing to waive constitutional right against self-incrimination impaired Fifth Amendment privilege); *Garrity v. New Jersey,* 385 U.S. 493, 500, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967) (holding that penalty of discharge for reliance on right to remain silent compelled policemen's incriminating testimony because it foreclosed a free choice to remain silent, and right against self-incrimination "prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office"), and the loss of the right to participate in political associations, *see Cunningham,* 431 U.S. at 808–09, 97 S.Ct. 2132 (depriving attorney of position as an unpaid political party officer would "impinge on his right to participate in private political associations"). *See also Gardner v. Broderick,* 392 U.S. 273, 278–79, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968) (reversing policeman's dismissal which was based solely on his refusal to waive immunity to which he would be entitled under the Fifth Amendment privilege against self-incrimination). There is nothing in our precedent that says a challenger must demonstrate a liberty interest to prevail on a Fifth Amendment right against self-incrimination claim.[8] *But cf. Tedder,* 1991 WL

---

8. In an unpublished decision, a panel of this court examined a similar Fifth Amendment challenge to a Colorado Department of Corrections' sex offender treatment program. *See Chambers,* 1994 WL 596702, at *3. The plaintiff alleged that the prison's policy of reducing the amount of good time for which he was eligible because he refused to admit he was a sexual offender violated his right against self-incrimination. The court held that there was no Fifth Amendment violation in part because the applicable regulation issued by the Department of Corrections mandated that information gained from the program remain confidential and in part because "there [was] no compulsion for Fifth Amendment purposes." *Id.* at *3. To the extent that *Chambers* may be interpreted as a rule that compulsion can occur only where one is forced to forgo a constitutional right or a liberty interest, we are not bound to follow it here. *See In re Citation of Unpublished Opin-*

65497, at *2 (holding that Oregon sex offender program did not violate plaintiff's right against self-incrimination in part because he has no constitutional right to discretionary parole before the expiration of his sentence); *Guilkey v. Holden,* 865 F.2d 258, 1988 WL 134526 (6th Cir.1988) (Table) (affirming district court determination that Fifth Amendment right against self-incrimination was not violated because plaintiff had no constitutionally protected liberty interest in discretionary parole). It is clear that the compulsion element of a Fifth Amendment claim can be established by penalties which do not constitute a deprivation of protected liberty interests under the due process clause.[9]

### b. Substantial and Potent Penalties

■ The next critical question is whether the consequences imposed constitute penalties that are sufficiently potent and substantial to implicate the Fifth Amendment. *See Cunningham,* 431 U.S. at 805, 97 S.Ct. 2132. Defendants argue that the prison's privileges and incentives program does not employ sanctions or penalties within the meaning of the Fifth Amendment. We are not so persuaded.

As noted above, Plaintiff's refusal to admit responsibility and disclose his sexual history would result in a transfer from medium security prison to maximum security. This transfer goes hand in hand with a reduction in the inmate's classification, from Level III to Level I, which would result in the loss and restrictions of many privileges. These include the loss of participation in prison organizations and activities, including the IMPP; the loss of personal TV; substantially restricted access to the yard area and gym; substantially restricted visitation rights; significantly restricted purchasing rights at the canteen in terms of the amount of dollars the inmate is permitted to spend per payroll period; reduction in incentive pay and corresponding job opportunities; and restricted ability to retain personal property. *See* App. at 29; Supp.App. at 100–01; *see also* Supp.App. at 66–68 (describing how much more dangerous maximum security is). In addition, the Warden of the Lansing Correctional Facility and the Secretary of the Kansas Department of Corrections confirmed by their deposition testimony that these and other restrictions would occur with the transfer of an inmate from Level III to Level I. *See* Supp.App. at 72 (admitting reduction in open yard schedule); Supp.App. at 80 (explaining movement from two-person cell in medium security to four-person cell or dorm in maximum security); Supp.App. at 81 (describing restrictions); Supp.App. at 103 (describing the greater potential for violence in maximum security); Supp.App. at 285 (explaining consequences for refusal to participate in program agreement).

We conclude that these deprivations and changes in environment are penalties sufficient to implicate the Fifth Amendment because they have substantial or potent effects on the inmate. *Cf. Brooker v. Warden,* No. 98–466–JD, 1999 WL 813893, at *4 (D.N.H. June 22, 1999) (recognizing "coercive effect of a requirement that an inmate satisfactorily participate in a sex offender treatment program" as a prerequisite to parole, but finding no compulsion because inmate voluntarily participated in program and because "he could choose not to participate without increasing the hardship of his incarceration since he was not

---

*ions/Orders & Judgments,* 151 F.R.D. 470 (10th Cir.1993).

9. While we do not necessarily disagree with the Kansas Supreme Court's determination that an inmate's housing and custody classifications and other privileges attendant to those classifications "are not atypical and do not pose a significant hardship within a prison" within the meaning of the due process clause,

*Bankes v. Simmons,* 963 P.2d at 420, our holding instructs that the liberty analysis should not be part of a Fifth Amendment privilege case. *Cf. Stansbury v. Hannigan,* 960 P.2d at 238 (considering appropriately in due process analysis that "[t]he restrictions imposed at Level I do not impose an atypical or significant hardship ... on an inmate which would not have been contemplated in his or her original sentence").

subject to any additional punishment for refusing to participate").

The Supreme Court's decision in *Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976), also illustrates how the consequences in this case constitute penalties within the Fifth Amendment. Mr. Palmigiano was an inmate of the Rhode Island Correctional Institution serving a life sentence for murder. He was charged with a disciplinary infraction, and, during his disciplinary hearing, he was told "that he had a right to remain silent but that if he remained silent his silence would be held against him." *Id.* at 312, 96 S.Ct. 1551. The Court held that an adverse inference may be drawn from a defendant's decision to remain silent at a prison disciplinary hearing without violating the prisoner's Fifth Amendment rights. *Id.* at 320, 96 S.Ct. 1551. The Court reasoned that "a prison inmate in Rhode Island electing to remain silent during his disciplinary hearing ... is not ... automatically found guilty of the infraction with which he has been charged" because of his silence. *Id.* at 317, 96 S.Ct. 1551. Thus, because "an inmate's silence in and of itself is insufficient to support an adverse decision by the Disciplinary Board," the court determined that the case was "very different from the circumstances before the court in the *Garrity–Lefkowitz* decisions, where refusal to submit to the interrogation and to waive the Fifth Amendment privilege, standing alone and without regard to other evidence, resulted in loss of employment." *Id.* at 318, 96 S.Ct. 1551.

The consequences at issue in this case are more like those in the *Garrity–Lefkowitz* decisions than in *Baxter.* Here, unlike in *Baxter,* Plaintiff's refusal to submit to the interrogation-to disclose the required information about his sexual history-standing alone, would certainly result in the transfer to Level I and the corresponding loss and restriction of many privileges. As a result, we think the substantial penalties imposed in this case rise above the threshold limit of consequences set forth in *Bax-*

*ter* which are acceptable and do not violate the Fifth Amendment.

### c. Voluntary Proceeding or Program

 Defendants also claim that the adverse consequences imposed in this case are not compulsory because Plaintiff could choose not to participate in the SATP. In other words, Defendants assert that Plaintiff's participation in the SATP is voluntary.

The record offers differing evidence concerning whether participation in the SATP is officially required by Department regulations. It appears that the program was required when Plaintiff was first recommended for it in 1994. The policy has since been amended such that, officially, inmates may "volunteer" to enter the SATP. However, even if participation in the SATP is not officially required of every sex offender, the policy of imposing certain administrative consequences upon an inmate in the event that he refuses to participate lends an element of compulsion. In light of the fact that the Department would impose sanctions solely because Plaintiff wishes to remain silent and invoke his Fifth Amendment right against self-incrimination, we cannot see how his participation in the SATP is truly voluntary.

In addition, we think this case is distinguishable from the Supreme Court's recent decision in *Ohio Adult Parole Auth. v. Woodard,* 523 U.S. 272, 118 S.Ct. 1244, 140 L.Ed.2d 387. In *Woodard,* the Court characterized the inquiry as "whether giving inmates the option of voluntarily participating in an interview as part of the clemency process violates an inmate's Fifth Amendment rights." *Id.* at 276, 118 S.Ct. 1244. Mr. Woodard, a death row inmate, argued that because there was only one guaranteed clemency review and because his answers could have been used against him the interview was not truly voluntary and therefore it violated the Fifth Amendment. *See id.* at 285, 118 S.Ct. 1244. The Court rejected this claim, concluding that the interview was volun-

tary and, as a result, Mr. Woodard was not compelled to speak. *See id.* at 286, 118 S.Ct. 1244. Because Mr. Woodard retained the choice whether to "provid[e] information to the [Parole] Authority-at the risk of damaging his case for clemency or for postconviction relief-or ... [to] remain[ ] silent[,] ... [t]he pressure to speak in the hope of improving his chance of being granted clemency does not make the interview compelled." *Id.* at 287–88, 118 S.Ct. 1244.

This case is distinguishable from *Woodard* for the simple reason that Mr. Woodard was not punished for invoking the Fifth Amendment privilege. Rather, the clemency interview was voluntary and Mr. Woodard's eligibility for clemency did not depend on his participation in the interview. Though his participation in the clemency interview may have affected his chances for clemency, no separate and distinct substantial or potent consequences were imposed for his refusal to participate in the interview. Plaintiff in this case, however, is punished for refusing to participate in the SATP and invoking his Fifth Amendment privilege. Unlike the situation in *Woodard,* Plaintiff is not even eligible for the SATP without disclosing the requisite information about his sexual history, and his refusal to disclose is met with very specific, potent, and substantial consequences.[10]

This case also differs from the Supreme Court's decision in *Minnesota v. Murphy,* 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409. In that case, the Supreme Court addressed the Fifth Amendment privilege in a probation setting. Mr.

Murphy was charged with criminal sexual conduct, pleaded guilty to a reduced charge, was placed on probation, and was required to participate in a sexual offender treatment program. In the course of the program, Mr. Murphy, without claiming his Fifth Amendment right against self-incrimination, admitted to an earlier rape and murder for which he was subsequently prosecuted. Bringing a § 1983 action, he argued that the confession was inadmissible because he was compelled to admit the crimes or face revocation of probation. *See id.* at 434, 104 S.Ct. 1136.

Relying on *Cunningham, Turley,* and other precedent, the Court observed that there was "a substantial basis" for concluding that an express or implied threat to revoke a convicted defendant's probation because he legitimately invoked the Fifth Amendment privilege would create "the classic penalty situation ... and the probationer's answers would be deemed compelled." *Id.* at 435, 104 S.Ct. 1136. Despite these pronouncements, the Court held that, although the state conditioned probation on the giving of truthful answers in the therapy program, it did not violate the Fifth Amendment because it had not "attempt[ed] to take the extra, impermissible step" of compelling the answers. *Id.* at 436, 104 S.Ct. 1136; *see also id.* at 437, 104 S.Ct. 1136. Thus, because Mr. Murphy was not required to disclose specific incriminating statements but merely was required to be truthful to his probation officer, and because he was not threatened with a penalty for invoking the privilege, the Court held that the state did not vio-

---

**10.** Our decision that participation in the SATP is not voluntary is in direct opposition to the decision in *Searcy v. Simmons,* 97 F.Supp.2d 1055, 1059 (D.Kan.2000). In *Searcy,* the district court interpreted *Woodard* as saying that there was no compulsion even though the inmate faced the loss of life. Based on this interpretation, the court concluded that there could be no compulsion from the loss of privileges and benefits. It therefore determined that the plaintiff's Fifth Amendment right against self-incrimination was not violated by the Kansas Department of

Corrections' IMPP 11–101 and SATP because the court viewed participation in the SATP as voluntary. *See id.* We disagree with the *Searcy* court's characterization of *Woodard* and its resulting decision on the Fifth Amendment claim. Mr. Woodard was not facing a choice between clemency or no clemency (i.e., between life or death) depending on whether he participated in the clemency interview. Indeed, the clemency review process would occur with or without his participation. *See Woodard,* 523 U.S. at 276, 287–88, 118 S.Ct. 1244.

late the Fifth Amendment. *See id.* at 437, 440, 104 S.Ct. 1136.

It is significant that Mr. Murphy was not required to disclose any specific information, nor was he penalized or punished for invoking his constitutional right. In short, other than the normal consequences flowing from his confession, Mr. Murphy was not punished or penalized *solely* for choosing to remain silent. However, that is exactly what would happen to Plaintiff here. Defendants' policy would respond to his refusal to admit responsibility and disclose his sexual history by transferring him to a higher level of security and substantially restricting the privileges that he had earned in the lower level of security.

### d. Other Analytical Factors

 Two additional considerations may generally be helpful in determining whether state action constitutes impermissible compulsion. The first is a distinction drawn between a privilege and a penalty. Defendants argue that a transfer from medium to maximum security housing and the attendant loss of privileges for refusing to participate in a prisoner treatment program do not constitute a penalty or punishment. Rather, these consequences are merely part of the Department's system of privileges and incentives utilized to encourage inmates to participate in programs. In other words, the State argues that punishment only occurs in response to a wrongful act taken by a prisoner.

This circuit has held that the characterization of state action as either withdrawing a privilege or imposing a penalty is indicative of whether the action constitutes compulsion. In *United States v. Rogers*, 921 F.2d 975, 982 (10th Cir.1995),

the court held that "the denial of a downward adjustment under § 3E1.1 does not constitute a penalty or an enhancement of sentence" for purpose of the Fifth Amendment. In reaching this conclusion, we explained:

> There is a difference between increasing the severity of a sentence for failure to demonstrate remorse and refusing to grant a reduction from the prescribed offense level. " 'It is one thing to extend leniency to a defendant who is willing to cooperate with the government; it is quite another thing to administer additional punishment to a defendant who by his silence has committed no additional offense.' "

*Id.* at 982–83 (citations omitted).

We do not believe that the distinction between a penalty and a privilege should be used as an absolute test for compulsion, but we believe that the distinction may be helpful in determining whether the government has sought to compel self-incriminating testimony.[11] Though it would be inappropriate to find compulsion in a situation where the state has unquestionably imposed a penalty but that penalty is so de minimis in nature as to have no compulsive effect, that is not the situation here. In this case, Plaintiff was placed in medium security housing before prison staff recommended that he participate in the SATP. His participation in the SATP was not part of his sentence or court-ordered. As noted by the district court, the consequences attendant to an inmate's refusal to participate in the SATP under IMPP 11–101 are exactly the same as those "punishments" automatically imposed upon a prisoner for termination from a work assignment for

11. The Supreme Court's decision in *Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979), although a due process case, also supports the view that the privilege/penalty distinction is useful in determining the existence of a constitutional right. In *Greenholtz,* the Court concluded that due process protections do not arise simply because the state holds out the possibility of release on parole. *See id.* at 11, 99 S.Ct. 2100. In reaching this conclusion, the Court specifically contrasted the granting of parole with the revocation of parole. *See id.* at 9–11, 99 S.Ct. 2100. The Court emphasized that "there is a human difference between losing what one has and not getting what one wants.... That the state holds out the possibility of parole provides no more than a mere hope that the benefit will be obtained." *Id.* at 10–11, 99 S.Ct. 2100.

cause, offenses for which felony charges are filed by a state prosecutor, or disciplinary convictions for offenses such as theft, drunkenness, use of narcotics, sodomy, riot, arson, assault, sexual activity, a relationship with staff, and possession of contraband. *See* App., Vol. I at 24–25; *Lile,* 24 F.Supp.2d at 1155 n. 3. Thus, it appears that in this case the Department's transfer action and the resulting loss of privileges are properly characterized as imposing penalties. This serves to buttress our conclusion that the loss and restriction of the earned privileges corresponding to Level III status solely for refusing to provide incriminating information constitute potent and substantial penalties that would likely cause Plaintiff to feel that he has no choice other than to incriminate himself.

■ The second consideration that bears on whether the government has sought to compel self-incrimination is the automaticity of the penalty. The district court found that "the prison administrative sanctions attendant to [P]laintiff's refusal, automatically imposed by operation of IMPP 11–101," *Lile,* 24 F.Supp.2d at 1158, are "impermissibly coercive" because they present a "costly burden to [P]laintiff's exercise of his rights under the Fifth Amendment." *Id.* at 1159. In several Supreme Court cases which all deal with attempts by prisoners or parolees to invoke the Fifth Amendment privilege and which hold that no constitutional violation occurred, none of the prisoners or parolees were automatically penalized for asserting the privilege. *See, e.g., Woodard,* 523 U.S. 272, 118 S.Ct. 1244, 140 L.Ed.2d 387, *Murphy,* 465 U.S. at 429, 104 S.Ct. 1136, and *Baxter,* 425 U.S. 308, 96 S.Ct. 1551. We believe that the distinction between an automatic and a conditional consequence is helpful in determining whether government action rises to the level of compulsion. *See Cunningham,* 431 U.S. at 808 n. 5, 97 S.Ct. 2132 (distinguishing *Baxter* on the ground that the penalty in that case was not imposed automatically). That said, the automaticity of a consequence is not dispositive in our determination because it fails to take into account the se-

verity of the penalty. It remains worth noting that, unlike the consequences at issue in *Woodard, Murphy,* and *Baxter,* the adverse consequences in this case would be imposed on Plaintiff automatically once he refused to admit responsibility and disclose his sexual history and thereby refused to participate in the SATP. *See* App., Vol. 1 at 24 ("An inmate shall be automatically reduced to Level I for … [r]efusal to participate in the recommended programs at the time of placement." (IMPP 11–101, pt. IV.B.2.)).

### 3. Constitutional Violation

■ For the foregoing reasons, we hold that there is a "reasonable basis for concluding that [Defendants] attempted to attach an impermissible penalty to the exercise of the privilege against self-incrimination." *Murphy,* 465 U.S. at 437, 104 S.Ct. 1136. The consequences that the Department would impose unless the constitutional privilege is surrendered in this case are sufficiently potent and substantial to constitute impermissible compulsion. Notwithstanding a Department regulation instructing that an "inmate shall not be penalized for refusal to participate in a formal program plan," Kan. Admin. Reg. § 44–5–105(c)(1), the policy that forces Plaintiff to choose between admitting incriminating information required for participation in the SATP and incurring the substantial and potent penalties that would be imposed if he refused to participate is "capable of forcing the self-incrimination which the Amendment forbids." *Cunningham,* 431 U.S. at 806, 97 S.Ct. 2132; *cf. State v. Imlay,* 249 Mont. 82, 813 P.2d 979, 985 (1991) (ruling that Fifth Amendment was violated where defendant's probation was revoked for his refusal to admit under a court-ordered sexual treatment program that he was guilty of the crime of which he had been charged and convicted). In sum, the State has violated Plaintiff's Fifth Amendment right against self-incrimination.

## C. Balancing

Although we have determined that there has been a violation of Plaintiff's constitutional right against self-incrimination, our analysis is not complete. Because of the institutional context of this case and the great deference that is owed to the management decisions and policies of prison officials, we believe it is appropriate to balance the prison's penological interests against the prisoner's constitutional right.[12] The Supreme Court routinely assesses the constitutionality of prison regulations and practices by examining whether the prison policy at issue "is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); *accord Frazier v. Dubois*, 922 F.2d 560 (10th Cir.1990). Though we are mindful of the historical importance of the right against self-incrimination, which emerged as a reaction to coercive and oppressive tactics used in the Spanish Inquisition, in the persecution of the Puritans in England, and by British colonial officials, we see no reason not to apply the balancing test of *Turner* here.

As a threshold matter, we examine whether the State has articulated its interests in requiring a participant in the SATP to disclose past sexual history. Though much of the State's briefs focus on its argument that the Fifth Amendment does not apply because Plaintiff has no protected liberty interest and because the benefits withheld did not constitute compulsory penalties, it is perfectly obvious from the briefs and the record that the State has two interests that are served by the SATP and its transfer policy: promoting rehabilitation and increasing public safety. For example, the State says:

> [T]he treatment of sex offenders serves the laudable goal of protecting the citizens of the state of Kansas. Additionally, as part of sexual abuse treatment, it is necessary for the participant to accept responsibility for his or her actions oth-

erwise treatment will not be effective. These substantial interests of the State of Kansas justify the Department of Corrections' interest in offenders participating in SATP to accept responsibility for their deviant behavior.

Appellants' Br. at 21. The State also emphasizes that "the Department of Corrections is justified in concluding that ... plaintiff and society would benefit from his meaningful participation in a treatment program. Meaningful participation would include a full and honest assessment of plaintiff's sexual deviances." *Id.* at 22; *see also id.* at 4, 5, 13; Third Br. on Cross Appeal at 3, 8. Thus, it is clear that the State's interests in rehabilitation and public safety are legitimate penological interests for its admission-of-responsibility policy. *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (stating that legitimate penological objectives include "rehabilitation, deterrence and security"). *But cf. Mace v. Amestoy*, 765 F.Supp. 847, 852 (D.Vt.1991) (stating that, while "the state has a legitimate rehabilitative purpose in demanding full disclosure" in a sex offense treatment program, the interest "does not make the disclosure any less incriminating" or violative of the Fifth Amendment privilege).

Because we believe that the prison policy impinges on Plaintiff's constitutional right against self-incrimination, we must determine whether the policy "is reasonably related to legitimate penological interests," *Turner*, 482 U.S. at 89, 107 S.Ct. 2254, by weighing the following four factors: (1) whether there is "a 'valid, rational connection' between the prison regulation [or practice] and the legitimate governmental interest" advanced as its justification, *id.* at 89, 107 S.Ct. 2254; (2) whether there are "alternative means of exercising the [constitutional] right" that remain open to prisoners notwithstanding the policy or regulation, *id.* at 90, 107

---

12. This balancing differs from Defendants' argument that government interest is significant in determining whether the Fifth Amendment has been violated because we apply the balancing analysis only after a constitutional violation has been found.

S.Ct. 2254; (3) what impact accommodation of the right would have on guards, other inmates, and the general allocation of prison resources, *see id.;* and (4) whether there are obvious, easy-to-implement alternatives that would accommodate the prisoner's right at little cost to valid penological interests. *See id.* at 90–91, 107 S.Ct. 2254.

It appears that the first question is answered in the affirmative: There is a rational connection between the policy of having prisoners admit responsibility for their offenses and disclose their sexual history in order to participate in the SATP and the legitimate governmental interest in rehabilitation of sex offenders. In fact, most mental health experts agree that "a sex offender must admit his guilt for treatment and rehabilitation to be successful." Brendan J. Shevlin, Between the Devil and the Deep Blue Sea: A Look at the Fifth Amendment Implications of Probation Programs for Sex Offenders Requiring Mandatory Admissions of Guilt, 88 Ky. L.J. 485, 485 (2000); *see also* Jonathan Kaden, Therapy for Convicted Sex Offenders: Pursuing Rehabilitation Without Incrimination, 89 J.Crim. L. & Criminology 347 (1998). This factor obviously weighs in favor of the State.

Second, there is no evidence that Plaintiff has any alternative means of exercising his Fifth Amendment right against self-incrimination. This is not like a case where a prisoner may have alternative means of exercising his First Amendment right to free exercise of religion. *See, e.g., Shabazz,* 482 U.S. at 351–53, 107 S.Ct. 2400 (treating the ability of Muslim prisoners to participate in other religious observances of their faith as one factor supporting the reasonableness of a restriction on the right of prisoners to attend Jumu'ah services); *Stewart v. Thomas,* 176 F.3d 489, 1999 WL 203165, at *3 (10th Cir.1999) (Table) (determining that Muslim inmate retained an alternative means of exercising his constitutional right because prison completely removed pork from the menu and inmates were able to eat meals before sunrise and after sundown). This factor weighs in favor of Plaintiff.

With respect to the third factor, there is no evidence that accommodation of the right would have any negative effect on guards, other prisoners, or prison resources. In fact, there is no suggestion that Plaintiff is a security or behavioral risk other than that he is not participating in the behavioral treatment program because he refuses to give up his Fifth Amendment right. This case clearly does not implicate the management and security of the prison population at large, but instead focuses on the rehabilitation of sex offenders in general and an individual prisoner specifically. If this factor weighs at all, it probably weighs slightly in favor of Plaintiff.

Fourth, the most "obvious, easy alternative" to the challenged policy would be one that has been contemplated by the Supreme Court since the very inception of the Fifth Amendment right against self-incrimination-granting immunity or privileging the statements disclosed. *See, e.g., Murphy,* 465 U.S. at 436 n. 7, 104 S.Ct. 1136; *Brown v. Walker,* 161 U.S. 591, 594–95, 16 S.Ct. 644, 40 L.Ed. 819 (1896). Many states, in fact, already incorporate some system of confidentiality into their treatment programs. *See, e.g.,* Cal. Evid. Code §§ 1012, 1014 (governing confidentiality of patient-psychotherapist in sex offender treatment program); Ky.Rev.Stat. Ann. § 197.440 (providing generally that admissions made within sex offender treatment program are privileged communications not subject to disclosure in civil or criminal proceeding); *see also Kirby v. Siegelman,* 195 F.3d 1285, 1289 (11th Cir. 1999) (noting district court's ruling that any admission of guilt required by sex offender treatment program would be privileged communication not subject to disclosure in a judicial proceeding under Alabama law); *Chambers v. Bachicha,* 1994 WL 596702, at *3 (noting Colorado Department of Corrections' Administrative Regulation 950–5 providing for confiden-

tiality of prison records); *Tedder v. Francke*, 1991 WL 65497, at *2 (stating that admissions made during sex offender treatment program were privileged under Oregon evidentiary rule, Or.Rev.Stat. § 40.230). An obvious tension exists between the goal of rehabilitation and the threat of further prosecution, a tension that would be eased by granting immunity or privileging statements. *See* Shevlin, 88 Ky. L.J. at 491–92, 500–02; Kaden, 89 J.Crim. L. & Criminology at 385–89. We are inclined to believe that prisons may better accomplish their goal of rehabilitation if they encourage inmates to admit their sex offenses by granting immunity or making statements privileged.[13]

The State claims that it "is not required to pursue its interest in having offenders sentenced to its custody participate in sexual abuse treatment at the expense of foregoing the criminal prosecution of sex crimes." Third Reply Br. at 13. The Supreme Court has stated, however:

> The privilege [against self-incrimination] has never been construed to mean that one who invokes it cannot subsequently be prosecuted. Its sole concern is to afford protection against being "forced to give testimony leading to the infliction of 'penalties affixed to ... criminal acts.'" Immunity from the use of compelled testimony, as well as evidence derived directly and indirectly therefrom, affords this protection.

*New Jersey v. Portash*, 440 U.S. 450, 457–58, 99 S.Ct. 1292, 59 L.Ed.2d 501 (1979) (quoting *Kastigar v. United States*, 406 U.S. 441, 453, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972)). Accordingly, an inmate like Plaintiff would not be immunized from any and all prosecution. Rather, he would receive immunity only from prosecution that is based on his immunized statements. Therefore the State does not lose anything it has not already lost because Plaintiff here invokes his right against self-incrimination and refuses to admit responsibility

for his offense of conviction and disclose his sexual history without being immunized.

In our view, this fourth factor weighs heavily in favor of Plaintiff. The prison can preserve its goal of reinforcing constructive behavioral changes in sex offenders, and Plaintiff's right against self-incrimination is not compromised because he is granted immunity for his disclosures (or such statements are privileged).

In sum, the real balance turns on the seriousness with which we have always treated the Fifth Amendment right against self-incrimination against the ease with which the State can accommodate or satisfy this right and still meet its legitimate program objectives. Because granting immunity or privileging statements in no way restricts the State's interests in rehabilitation or public safety, we think the *Turner* balancing easily weighs in favor of Plaintiff. While we applaud the efforts of states to rehabilitate prisoners, especially where their crimes involve sexual offenses and abuse of children, they may not tie rehabilitation to an inmate's surrender of his Fifth Amendment right against self-incrimination where the *Turner* balancing weighs in favor of the inmate. Therefore, we conclude that the policy is not reasonably related to legitimate penological objectives, and we hold that it violates Plaintiff's Fifth Amendment right against self-incrimination. We accordingly affirm the district court's judgment granting summary judgment to Plaintiff on his Fifth Amendment claim. Though the State cannot penalize Plaintiff for invoking his Fifth Amendment right in this case, it can determine if it wishes to modify its program by implementing a system of confidentiality or granting immunity.

## II. Fourth Amendment

Because we have determined that the Kansas SATP unconstitutionally violates

---

13. While there may be incrimination problems for future perjury which is typically not immunized, any perjury in this case stemming

from a not-guilty plea would be past perjury and would be immunized like other past crimes.

Plaintiff's Fifth Amendment right against self-incrimination, his appeal on the Fourth Amendment claim is moot. We therefore vacate the portion of the district court's judgment granting summary judgment to Defendants on the Fourth Amendment claim and remand to the district court with instructions to dismiss that claim as moot.

AFFIRMED in part and VACATED and REMANDED in part.